UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| RAYMOND HUNTER, SR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 1:09-CV-246 |
| v. | ) |
| | ) |
| CVS PHARMACY and | ) Chief Judge Curtis L. Collier |
| ABBOTT LABORATORIES | ) |
| | ) |
| Defendant. | ) |

## **MEMORANDUM**

Plaintiff Raymond Hunter, Sr. ("Mr. Hunter"), acting *pro se*, brings this lawsuit alleging he suffered arsenic poisoning from medication he purchased from Defendant CVS Pharmacy (properly known as Revco Discount Drug Centers, Inc.) ("Revco"), and manufactured by Defendant Abbott Laboratories ("Abbott") (collectively "Defendants"). Before the Court is Defendants' motion for summary judgment, which is supported by a memorandum (Court File Nos. 68, 70), Mr. Hunter's response brief (Court File No. 74), and Defendants' reply brief (Court File No. 77). For the following reasons , the Court will **DENY IN PART** and **GRANT IN PART** Defendants' motion for summary judgment (Court File No. 68).

**I.   RELEVANT FACTS**

Mr. Hunter is a 71-year-old retiree who suffers from hyperthyroidism, among other ailments (Court File No. 68-1, p. 4). Around 2002 Mr. Hunter began taking the medication Synthroid, manufactured by Abbott, for his hyperthyroidism (*id.* at 5). Mr. Hunter filled his prescriptions for Synthroid pills at a Revco pharmacy in Chattanooga, Tennessee, and took the drug for years without incident (Court File No. 1, p. 2). However, on May 20, 2009, Mr. Hunter obtained from Revco the

Synthroid pills which give rise to this litigation, pills Mr. Hunter claims were tainted with the deadly poison arsenic.

According to Mr. Hunter, he started feeling sick after just three days of taking the Synthroid pills obtained on May 20, 2009 (*id*.). After seven days, Mr. Hunter describes feeling "very, very sick," and experiencing "bad headache, bad sweats, stomach sickness and dizziness" (*id*.). At this point, Mr. Hunter stopped taking the Synthroid pills he obtained from Revco. He obtained new Synthroid pills from a Walgreens Pharmacy, and his condition allegedly improved (*id*.). At the time Mr. Hunter filed his complaint, he had filled three prescriptions at Walgreens and was feeling progressively better (*id*.). At his January 12, 2010 deposition, Mr. Hunter described himself as "feeling great" (Court File No. 68-1, p. 17).

Despite the symptoms Mr. Hunter suffered after taking the allegedly poisoned pills, he did not seek prompt medical treatment (*id*. at 15). He did, however, take a number of the Revco and Walgreens Synthroid pills for testing at several laboratories: Technical Laboratories, Inc. ("Technical Labs"), Analytical Industrial Research Laboratories, Inc. ("Analytical Labs"), and Culligan Water ("Culligan").[1] Mr. Hunter apparently delivered the Synthroid pills to the laboratories after processing them in various ways. One lab report describes the sample as a "tablet" (Court File No. 1-1, p. 6), another as a "powder" (Court File No. 68-4, p. 7), another as a "pill" (*id*. at 4), another as a "solid sample" (Court File No. 1-1, p. 7), and two others as "water samples" (*id*.

---

[1]Mr. Hunter also conducted some home experiments comparing the "bad" Revco Synthroid pills with the "good" pills from Walgreens. Mr. Hunter's notes describe an experiment in which the Revco pills sunk to the bottom of a water-filled container while the Walgreens pills floated, as well as an experiment in which Mr. Hunter observed dissolved Revco pills to reflect more light than dissolved Walgreens pills (Court File No. 1-1, p. 9).

2

at 8, 10).[2] The lab reports do indeed indicate the presence of arsenic in at least some of the tested substances.[3] At various points Mr. Hunter also provided both the Food and Drug Administration ("FDA") and Abbott with allegedly tainted Synthroid pills. However, neither the FDA nor Abbott detected arsenic in the pills (Court File No. 68-2, pp. 27, 35).

Eventually, Mr. Hunter did seek medical testing and treatment for his suspected arsenic poisoning. On August 4, 2009, two and a half months after Mr. Hunter had ceased ingesting the allegedly tainted pills, he submitted urine for testing at Physicians Care Clinic. The lab report showed Mr. Hunter's urine contained 15 µg/L, which the report identified as "WNL" – within normal limits (Court File No. 68-7, p. 2). On August 10, 2009, Mr. Hunter returned to Physicians Care Clinic and obtained a prescription for an arsenic hair test (Court File No. 1-1, pp. 1-4). The hair test was performed by Technical Labs on August 19, 2009, and showed a positive result of 0.4 ppm arsenic (*id*. at 5). On August 25, 2009, Mr. Hunter again went to Physicians Care Clinic and was examined by a nurse. The nurse's notes state Mr. Hunter told her after ingesting the suspect Synthroid pills he suffered "bad HA's [headaches], bad sweats, GI problems, [and] dizziness" (Court File No. 74-15, p. 32).

---

[2]Mr. Hunter describes his methodology for preparing the water samples as crushing Synthroid pills with a butter knife and dissolving them in distilled water (Court File No. 68-1, p. 27).

[3]Technical Labs analysis of "tablet" shows 1 ppm arsenic (Court File No. 1-1, p. 6). Technical Labs analysis of "powder" shows 1.2 ppm arsenic (Court File No. 68-4, p. 7). Analytical Labs analysis of "pill" shows <2 mg/Kg arsenic (*id*. at 4). Analytical Labs analysis of "solid sample" shows 2.6 mg/Kg arsenic (Court File No. 1-1, p. 7). Analytical Labs analysis of "water sample" shows 0.017 mg/L arsenic (*id*. at 8). Culligan did not have the capability to test specifically for the presence of arsenic, only for total dissolved solids ("TDS") and conductivity (measured in "micros") (Court File No. 68-1, p. 23). Its analysis of a "water sample" showed 3.8 ppm TDS and 6 micros in the Revco sample, and 3.6 ppm TDS and 5.6 micros in the Walgreens sample (*id*. at 10).

On September 2, 2009, Mr. Hunter took a sample of his fingernail to be tested by Technical Labs. The results showed arsenic was present in Mr. Hunter's fingernail at a level of <0.5 ppm (Court File No. 68-10, p. 2). Additionally, in October, 2009, Mr. Hunter visited Dr. Robert Burkich, who had an arsenic hair test performed on Mr. Hunter. The test showed Mr. Hunter's hair contained 0.066 μg/g arsenic (Court File No. 68-11, p. 2). In deposition testimony, Dr. Burkich explained this level of arsenic was similar to that of an average person, and was not suggestive of arsenic poisoning (Court File No. 68-12, pp. 3-5).

Defendants have retained an expert, Dr. Donna L. Seger, who provides background information on arsenic poisoning, or "arsenic toxicity," and offers an opinion on whether Mr. Hunter suffers from arsenic toxicity. According to Dr. Seger, organic arsenic is a naturally occurring, non-harmful substance found in living things (Court File No. 69, ¶ 7). Hence, the mere presence of arsenic in the body is not evidence of damage to the body (*id*.). On the other hand, inorganic arsenic is a harmful substance that, in high concentrations in the body, causes arsenic toxicity (*id*. at ¶ 8). Arsenic toxicity may be diagnosed by a blood test (which detects inorganic arsenic), or a fractionated urine test (which separates organic arsenic from inorganic arsenic) (*id*. at ¶ 11). Mr. Hunter did not have an arsenic blood test, nor did he have a fractionated urine test. Rather, his urine was tested for *total* arsenic, which showed total arsenic to be within normal limits, thus the further step of fractionating the urine was not conducted (Court File No. 68-7, p. 2). Dr. Seger also states neither hair tests nor fingernail tests are valid tests to diagnose arsenic toxicity in live human beings, because the sample size needed for accurate results is impracticable to obtain while someone is still living, and because these tests do not distinguish between organic and inorganic arsenic (Court File No. 69, ¶ 13-14). According to Dr. Seger, attempting to diagnose arsenic toxicity based on hair and

4

fingernail tests would not meet the proper standard of medical care (*id*. at ¶ 15). Finally, Dr. Seger opines Mr. Hunter did not, at his alleged time of ingestion of arsenic, demonstrate typical symptoms of acute arsenic toxicity, such as nausea and vomiting (*id*. at ¶ 19). Mr. Hunter has not offered any expert testimony to challenge Dr. Seger's description of arsenic toxicity, or her conclusion none of the tests performed on Mr. Hunter suggest arsenic toxicity.

Mr. Hunter has sued Defendants, alleging they negligently or recklessly inflicted physical and emotional injury on him through their distribution of arsenic-laced Synthroid pills. As physical damages, Mr. Hunter claims arsenic may have damaged his organs, and has caused him heart trouble, high blood pressure, headaches, stomach trouble, decreased energy, fatigue, and decreased sleep. By way of emotional damages, Mr. Hunter claims his ingestion of arsenic has caused him major depressive disorder, difficulty with attention, sadness, and the trauma of not knowing if he is going to die from arsenic stored in his body (Court File No. 1, p. 3). He seeks compensatory as well as punitive damages. Defendants have moved for summary judgment on all claims.

## II.   STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The Court views the evidence, including all reasonable inferences, in the light most favorable to the non-movant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). However, the

non-movant is not entitled to a trial based merely on its allegations; it must submit significant probative evidence to support its claims. *Celotex*, 477 U.S. at 324; *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Should the non-movant fail to provide evidence to support an essential element of its case, the movant can meet its burden of demonstrating no genuine issue of material facts exists by pointing out such failure to the court. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

At summary judgment, the Court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). If the Court concludes a fair-minded jury could not return a verdict in favor of the non-movant based on the record, the Court may enter summary judgment. *Id.* at 251-52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

## III. ANALYSIS

For the sake of clarity, the Court will first consider Mr. Hunter's negligence claims before turning to his claim for punitive damages.

### A. Negligence

To establish negligence under Tennessee law, a plaintiff must establish the following elements: "(1) a duty of care owed by defendant to plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate, or legal, cause." *Giggers v. Memphis Hous. Auth.*, 277 S.W.3d 359, 364 (Tenn. 2009) (citation omitted). Defendants concede the first element, and do not deny there is a question of fact as to the second. However, Defendants contend they are entitled to summary judgment because Mr.

6

Hunter cannot, as a matter of law, prove injury or causation.

### 1. Physical Injury

Defendants claim Mr. Hunter has presented no evidence he was physically injured by ingesting the allegedly arsenic-tainted Synthroid pills. Relying on the affidavit of Dr. Seger, Defendants point out the mere presence of arsenic in the body is not itself an injury or evidence of injury, since organic arsenic is a naturally-occurring, non-harmful substance which people are exposed to on a daily basis (Court File No. 69, ¶ 7). In order to show one has been injured by arsenic, that is, that one has arsenic toxicity, one would need to show the presence of inorganic arsenic in the body at injurious levels (*id*. at ¶ 9). However, Mr. Hunter has not had any tests which show inorganic arsenic to be present in his body at injurious levels. In her affidavit, Dr. Seger testified blood and fractionated urine tests are two reliable methods of diagnosing arsenic toxicity. (*id*. at ¶ 11). Mr. Hunter did not receive an arsenic blood test. He did receive a urine test. However, his total level of urinary arsenic – organic plus inorganic – was within normal limits (Court File No. 68-7, p. 2). He also received hair and fingernail tests, which came back positive for some level of arsenic. However, Dr. Seger testified hair and fingernail tests are not valid methods of diagnosing arsenic toxicity in live humans, inasmuch as they do not distinguish between organic and inorganic arsenic, and require impracticable sample sizes to be useful (Court File No. 69, ¶¶ 13-15). Moreover, Dr. Burkich, who performed Mr. Hunter's second arsenic hair test, testified at deposition the results did not suggest arsenic toxicity, but rather were those of an average person (Court File No. 68-12, pp. 3-5).

For Mr. Hunter's part, he acknowledges the tests do not indicate arsenic toxicity. However, he claims these results are unsurprising given the long interval between when he ingested the

allegedly-tainted Synthroid in May 2009, and when he underwent testing. According to Mr. Hunter, arsenic urine tests need to be conducted within a few days of ingestion for accurate results. However, he did not have a urine test until August 2009, about two months after he stopped taking the allegedly-tainted pills (Court File No. 68-7, p. 2). Similarly with the hair tests, Mr. Hunter avers much of the arsenic would have left his body between the time he ingested the pills and when he had his hair tested. Moreover, Mr. Hunter states he received fifteen hair cuts during the five months between ingesting the pills and the second hair test, and these hair cuts would have diminished the amount of arsenic present in his hair. Mr. Hunter asserts if the tests would have been done much sooner, they would have shown high levels of arsenic in his body.

Defendants are correct Mr. Hunter has not produced evidence by which a reasonable jury could find he has arsenic toxicity. None of the evidence Mr. Hunter presents contradicts the expert opinions of Dr. Seger regarding the nature of arsenic toxicity, the reliability of different testing methods, and the diagnostic insignificance of the tests performed on Mr. Hunter. Mr. Hunter may very well be right the tests performed on his urine, hair, and fingernail were done too late to detect arsenic toxicity, and if performed sooner would have had different results. But this simply underscores the fact there is no evidence *presently* before the Court that would support a finding Mr. Hunter has sustained the injury of arsenic toxicity. The Court's task at summary judgment is to determine whether the non-movant has submitted significant probative evidence to support its claims. *Celotex*, 477 U.S. at 324. The only medical expert proof in the record unequivocally states Mr. Hunter's tests do not indicate arsenic toxicity. Even viewed in the light most favorable to Mr. Hunter, tests which do not show arsenic toxicity are simply not significant probative evidence that one has arsenic toxicity.

However, Defendants are incorrect to conclude Mr. Hunter can prove no physical injury simply because he cannot prove arsenic toxicity. In her affidavit, Dr. Seger explained why Mr. Hunter's test results, obtained several months after he allegedly ingested arsenic, do not suggest he was suffering from arsenic toxicity when the tests were performed. However, she also listed the physical symptoms that would ordinarily be immediately associated with acute inorganic arsenic poisoning: nausea and vomiting (Court File No. 69, ¶ 19). Dr. Seger stated Mr. Hunter did not, at his time of ingestion, manifest these symptoms (*id.*). However, this statement appears to be factually incorrect. In his complaint, Mr. Hunter claims he experienced "stomach sickness" immediately after taking the allegedly-tainted Synthroid pills (Court File No. 1, p. 2). Additionally, notes taken when Mr. Hunter visited Physicians Care Clinic on August 25, 2009, show Mr. Hunter told the nurse he suffered "GI problems" immediately after ingesting the pills (Court File No. 74-15, p. 32). Mr. Hunter's claimed symptoms appear consistent with Dr. Seger's description of what would befall a person who had just ingested inorganic arsenic. Thus, Mr. Hunter's evidence raises a genuine issue of fact with respect to short-term physical injury immediately following his ingestion of the pills, though it does not, as a matter of law, with respect to any longer-term aspects of arsenic toxicity.

### 2. Emotional Injury

Defendants likewise argue Mr. Hunter has presented no evidence of emotional injury resulting from his ingestion of the allegedly-tainted Synthroid pills. In Tennessee, a plaintiff seeking to recover for emotional injury in a personal injury case must show either an accompanying actual physical injury to which emotional damages are "parasitic," *Flax v. DaimlerChrysler Corp.*, 272 S.W.3d 521, 529 (Tenn. 2008) (citation omitted), or, in the absence of physical injury, actual

9

exposure to a harmful agent. *See Guess v. Sharp Mfg. Co. of Am.*, 114 S.W.3d 480, 485-86 (Tenn. 2003); *Carroll v. Sisters of Saint Francis Health Servs.*, 868 S.W.2d 585, 593-94 (Tenn. 1993). These requirements serve an "objectivizing function," *Carroll*, 868 S.W.2d at 593; that is, they help "avoid[] the trivial or fraudulent claims that have been thought to be inevitable due to the subjective nature of [emotional] injuries." *Flax*, 272 S.W.3d at 527 (quoting *Camper v. Minor*, 915 S.W.2d 437, 440 (Tenn. 1996).

Defendants' argument Mr. Hunter cannot prove emotional injury begins from the premise Mr. Hunter has no evidence of physical injury, and then goes on to discuss why Mr. Hunter cannot satisfy the alternative requirement of showing actual exposure. However, as explained above, Mr. Hunter has indeed raised a question of fact as to physical injury immediately following his ingestion of the allegedly-tainted pills. Mr. Hunter's claim for emotional damages is intertwined with his alleged physical injury, insofar as it involves anguish, sadness, and fear directly resulting from his ingestion of arsenic and the ensuing physical symptoms. Furthermore, as will be explained below, Mr. Hunter has raised a genuine issue of fact concerning his exposure to arsenic in the suspect Synthroid pills. Thus, both under the "physical injury" prong and the "actual exposure" prong, Mr. Hunter has raised an issue of fact concerning emotional damages, and summary judgment for Defendants on this matter is therefore improper.

### 3. Causation

Finally, Defendants argue even if Mr. Hunter can show injury, his claims for physical and emotional damages must fail because he cannot, as a matter of law, prove the causation element of a negligence claim. Defendants' clarity on this point is less than ideal, but the Court construes their logic to be as follows:

- To show Defendants caused his injury, Mr. Hunter must show he was actually exposed to inorganic arsenic in the suspect Synthroid pills.
- Actual exposure could be shown either through tests on Mr. Hunter's body showing arsenic toxicity, or tests on the actual pills Mr. Hunter ingested showing the presence of arsenic.
- The tests performed on Mr. Hunter's body did not show arsenic toxicity.
- Tests on the actual pills Mr. Hunter ingested are impossible, since those pills cannot be retrieved from Mr. Hunter's body.
- Moreover, positive arsenic results from other pills in the allegedly-tainted prescription are irrelevant, since Mr. Hunter obviously has not ingested these pills.
- Therefore, it is impossible for Mr. Hunter to show he was actually exposed to inorganic arsenic in the Synthroid pills.

The flaw in this argument is Defendant's assumption Mr. Hunter cannot show actual exposure to arsenic by showing remaining pills in the suspect prescription contained arsenic. While it is of course true, Mr. Hunter did not ingest the specific pills he submitted for testing, it is untrue Mr. Hunter can only show the pills he ingested contained arsenic by obtaining test results on those specific pills. A rational trier of fact, faced with evidence pills in the suspect prescription contained arsenic, could reasonably infer the pills Mr. Hunter ingested from that prescription also contained arsenic.

Mr. Hunter has presented evidence suggesting the Synthroid pills he obtained from Revco on May 20, 2009, pills he ingested seven times before discontinuing use, contained arsenic. Defendants, for their part, do not dispute Mr. Hunter obtained test results, purportedly of the Synthroid pills he obtained from Revco, which showed the presence of some level of arsenic. This is a sufficient evidentiary showing to raise a genuine issue of fact as to Mr. Hunter's actual exposure to arsenic in the Synthroid pills, that is, to the causation element of Mr. Hunter's negligence claims. Of course, there are disputed questions regarding the chain of custody of the suspect pills, the scientific reliability of Mr. Hunter's methods of preparing samples for testing, and the significance

11

of the results. However, these are questions appropriate to the trier of fact; they are not for the Court to decide at summary judgment.

### B. Punitive Damages

Tennessee courts restrict punitive damages "to cases involving only the most egregious of wrongs." *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992). Accordingly, a plaintiff seeking punitive damages must show "a defendant has acted either (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly." *Id*. Furthermore, given punitive damages' "twin purposes of punishment and deterrence," a plaintiff must prove the defendant's egregious conduct by clear and convincing evidence, rather than a simple preponderance. *Id*. In Mr. Hunter's complaint, he seeks punitive damages "on account of or [sic] reckless conduct of CVS Pharmacy and Abbott Laboratories" (Court File No. 1, p. 4). According to Tennessee law, a person acts recklessly when he "is aware of, but consciously disregards, a substantial and unjustifiable risk of such a nature that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances." *Hodges*, 833 S.W.2d at 901. Thus, to secure punitive damages, Mr. Hunter bears the burden of showing by clear and convincing evidence Defendants were aware of, but consciously disregarded, the substantial and unjustifiable risk he would be poisoned by arsenic in the Synthroid pills. This is a burden Mr. Hunter cannot meet.

While Mr. Hunter has put forward some evidence suggesting he received medication containing arsenic, none of his evidence is probative of the higher culpability necessary to sustain punitive damages. Moreover, Mr. Hunter himself concedes Defendants' actions were not "a gross deviation from the standard of care." *See id*. At his deposition, Mr. Hunter stated he was not

claiming the arsenic contamination was Defendant's "fault." He then suggested it could be the work of a terrorist within Defendants' companies. Asked if he had any proof regarding terrorists in Defendants' companies, Mr. Hunter responded as follows:

> Answer: Well, I don't believe they deliberately put that [arsenic] in there.
>
> Question: You don't believe Abbott or CVS deliberately . . .
>
> Answer: No.
>
> Question: Either place?
>
> Answer: No. I don't believe that. No way. I believe it's some kind of accident or some kind of something that took place, and it could happen anywhere. People contaminate stuff all the time by accident . . . .

(Court File No. 69-1, p. 35). This testimony makes clear Mr. Hunter does not, in fact, believe there is evidence demonstrating Defendants acted in a manner that could give rise to punitive damages liability. Rather, he believes they acted non-deliberately or accidentally, that is to say, negligently. The record shows this belief to be warranted, as it contains no evidence suggesting Defendants were aware of, but consciously disregarded, the risk of arsenic contamination in Mr. Hunter's Synthroid pills. Accordingly, as Mr. Hunter appears to concede, summary judgment is appropriate for Defendants on Mr. Hunter's claim for punitive damages.

## IV. CONCLUSION

The Court finds there are genuine issues of material fact with respect to Mr. Hunter's negligence claim. However, the Court finds there is no genuine issue of material fact with respect to Mr. Hunter's claim for punitive damages. Accordingly, Defendants' motion for summary judgment will be **GRANTED IN PART** with respect to the claim for punitive damages, and

**DENIED IN PART** with respect to the negligence claim. Mr. Hunter's negligence claim seeking damages for physical injury sustained immediately after taking the allegedly-tainted Synthroid pills, and for emotional injury, will proceed to trial.

      An Order shall enter.

/s/
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**